# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| FRANCISCO ROMERO, | ) | |
| | ) | Case No. 25-cv-07074 |
| *Plaintiff,* | ) | |
| | ) | |
| *v.* | ) | |
| | ) | |
| ALLEN SZUDARSKI, JOHN HENRY, | ) | |
| THOMAS CEPEDA, DANIEL | ) | **JURY TRIAL DEMANDED** |
| MCNALLY, GEORGE HOLMES, | ) | |
| WILLIAM GEHRKE, ROBERT TRLAK, | ) | |
| WILLIAM SVILAR, STEVEN KONOW, | ) | |
| CRAIG COUGHLIN, DANIEL | ) | |
| BRANNIGAN, MICHAEL | ) | |
| MCDERMOTT, KENNETH | ) | |
| BOUDREAU, and the CITY OF | ) | |
| CHICAGO, | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |
| | ) | |

## COMPLAINT

Plaintiff Francisco Romero, by his attorneys Loevy & Loevy and Blagg Law, complains of Defendants Allen Szudarski, John Henry, Thomas Cepeda, Daniel McNally, George Holmes, William Gehrke, Robert Trlak, William Svilar, Steven Konow, Craig Coughlin, Daniel Brannigan, Michael McDermott, Kenneth Boudreau, and the City of Chicago, along with as-yet unknown employees of the City of Chicago, states as follows:

## INTRODUCTION

1.     Francisco Romero spent more than 22 years in prison for a crime he did not commit, the tragic shooting of 11-year-old Francisco Macias on July 28, 2001.[1]

2.     Romero had nothing to do with the crime. Not one piece of physical or forensic evidence connected him to the murder.

3.     Still, Romero was arrested, prosecuted, and convicted of a crime he did not commit because Defendants manufactured evidence against Romero and suppressed information that would have prevented his arrest, prosecution, and conviction from ever happening.

4.     The manufactured evidence came in two main forms. Defendants used an informant to deliberately and falsely pin the shooting on Romero despite knowing he was innocent.

5.     Before the shooting, Defendants were running "Operation Stickman," which used a known kidnapper and Latin Saint gang member as an informant to rat out his fellow gang members. After months of funding and zero charges, Defendants were desperate to justify the continued existence of the program.

6.     Their solution? Defendants began forcing the informant to frame innocent people, including Romero, by fabricating evidence and confessions. For

---

[1] There are a few shared names in this case. To help mitigate any confusion, the plaintiff, Francisco Romero, is referred to only as "Romero" or "Plaintiff." In contrast, the victim, Francisco Macias, is referred to only as "Francisco." Further complicating things, Francisco Macias also shares his last name with Juan Macias, who witnessed the crime. *See infra* pp. 6, 9–10. He is referred to only as "Juan." So there is Romero (the plaintiff), Francisco (the victim), and Juan (the witness).

instance, once Defendants decided to frame Romero, they fed the informant facts about the case and forced him to fabricate the evidence and false confessions they wanted.

7.     Defendants then wrote reports documenting the fabricated evidence they had created to support charges against Romero, while destroying files and hiding exculpatory evidence to cover their tracks.

8.     Defendants also manipulated an 11-year-old boy into making a false and fabricated identification of Romero, both in a photo array and a live lineup.

9.     Defendants' combined misconduct caused Romero to be convicted following a trial in 2006 and sentenced to 65 years in an Illinois prison—a *de facto* life sentence.

10.     Defendants' scheme did not come to light until Romero's post-trial attorneys uncovered new evidence that established the manner and breadth of Defendants' misconduct.

11.     Romero remained wrongfully convicted until the charges were finally dismissed on June 26, 2024, after his conviction had been thrown out based on a finding of actual innocence.

12.     Romero received a certificate of innocence in April 2025.

13.     The more than two-decades-long saga of wrongful murder charges has caused Romero tremendous harm. His life was essentially put on hold; missing out on irreplaceable time with family and friends while he was in prison enduring extended periods of solitary confinement with restricted contact with his family,

violence and extreme conditions; Romero feared that he would never see the outside of his prison walls ever again, and he constantly struggled with the knowledge that he would likely spend the rest of his life carrying around the label of "murderer" for a crime he did not commit.

14.     Romero's wrongful conviction was no accident. Nor was it an isolated incident. Rather, the misconduct that caused Romero's wrongful conviction is part of a much larger pattern and practice of corruption and a culture of misconduct within the Chicago Police Department, and thus, the City of Chicago.

15.     Romero now brings this lawsuit seeking justice for the harm Defendants have caused and redress for the loss of liberty and devastating injuries he has endured (and continues to suffer) because of Defendants' misconduct.

## JURISDICTION AND VENUE

16.     This action is brought under 42 U.S.C. § 1983 and Illinois law to redress the Defendants' tortious conduct and their deprivation of Plaintiff's rights secured by the Constitution.

17.     This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over his state-law claims pursuant to 28 U.S.C. § 1367.

18.     Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district. The events and omissions giving rise to his claims also occurred within this judicial district, including the investigation, prosecution, and trial resulting in Plaintiff's wrongful conviction.

## PARTIES

19.     Plaintiff spent more than 22 years wrongfully incarcerated for a crime he did not commit.

20.     At all relevant times, Defendants Allen Szudarski, John Henry, Thomas Cepeda, Daniel McNally, George Holmes, William Gehrke, Robert Trlak, William Svilar, Steven Konow, Craig Coughlin, Daniel Brannigan, Michael McDermott, Kenneth Boudreau, and other unknown law enforcement officers were police officers in the Chicago Police Department ("CPD Defendants" or "Defendant Officers"), acting under color of law and within the scope of their employment for the City of Chicago.

21.     The City of Chicago is an Illinois municipal corporation that is or was the employer of the CPD Defendants. During their investigation of Francisco's murder, each of the CPD Defendants acted as agents or employees of the City of Chicago. As a result, the City of Chicago is liable for all torts committed by the CPD Defendants pursuant to the doctrine of *respondeat superior*. The City of Chicago is also responsible for the policies and practices of the Chicago Police Department.

22.     Every individual Defendant, known and unknown, acted under the color of law and within the scope of their employment at all times relevant to this lawsuit. Each of the individual Defendants is sued in their individual capacity unless otherwise noted.

## FACTS

### The Tragic Shooting of Francisco Macias.

23.     On July 28, 2001, 11-year-old Francisco Macias was standing on the sidewalk outside a house in Chicago's Back of the Yards neighborhood, located at 1714 West 48th Street.

24.     Francisco was with at least six other people.

25.     There were three other kids outside the house: Another 11-year-old, Edgar Jimenez; 10-year-old Ivan Diaz; and Jeffrey Hooper, who was 15. The kids were all playing and sharing a bicycle.

26.     There were also three known members of the Latin Souls street gang present—José Cepeda, Juan Macias, and Jesus "Anthony" Diaz—who lived at the house they were standing in front of.

27.     The house belonged to Anthony. He was sitting out front with Hooper. Juan was leaning on a car in front of the house, talking to Ivan.

28.     There was a small alleyway between the house and the neighbor's house (known as a "gangway"). There was a wrought-iron gate on the front end of the gangway that separated the public sidewalk in front of the house (where Francisco and the others were talking and playing) from the gangway itself.

29.     The gangway led to the back of the house, where there was another gate. On the other side of the back gate was a small alleyway with detached garages. This alleyway connected to side streets on both ends.

6

30.     Around 3:50 p.m., an unknown assailant ran from the back of the house up the gangway and tried to open the front gate.  But the gate was locked and would not open.

31.     The person then pointed a gun between the bars of the gate and fired one shot in the group's direction.

32.     Francisco was struck in the head and fell to the ground.

33.     The shooter pulled the gun back through the bars of the gate and took off running back down the gangway towards the back alley.

34.     Everything happened in a few seconds.

35.     Jimenez immediately turned and ran to a nearby beauty salon; Ivan went with him. Hooper jumped up from the stoop (where he was sitting) and rushed into the house.

36.     Juan took off and ran to his house, which was just one block away.

37.     José and Anthony remained at the scene.

38.     Francisco later died as a result of the gunshot wound.

**The Initial Investigation
On the Day of the Shooting.**

39.     Police arrived on scene shortly after the shooting, including Defendants Henry, Szudarski, Cepeda, Trlak, McNally, Svilar, Coughlin, Gehrke, Konow, and Holmes.

40.     When they arrived, the police interviewed José about the shooting. José confirmed that he saw the shooter grab and rattle the front gate before sticking a silver handgun through the bars of the gate, firing one shot.

41.     José also described the shooter: He was an 18- to 20-year-old-Hispanic male. The shooter was wearing a dark blue baseball cap and a blue, short-sleeved shirt that had both vertical and horizontal white stripes on it.

42.     José also gave details about the shooter's appearance: He had a thin mustache, goatee, and a teardrop tattoo under his right eye.

43.     For height and weight, José said the shooter was between five feet eight inches (5'8") and five feet nine inches (5'9") tall, and about 150 pounds.

44.     Defendant Allen Szudarski worked with José to create this composite sketch of the shooter:



45.     The sketch was widely released to the police, media, and the public.

46.     The police also collected fingerprints from three locations: (1) the lock on the inside of the front gate (i.e., where the shooter ran up to and tried to open it); (2) the mailbox hanging on the front gate; and (3) the lock on the back gate.

47.     When doing so, the police confirmed that the front gate was locked.

48.     The police also talked to Anthony and Hooper at the scene. They both indicated that they had not been able to see the shooter and could provide no description.

49.     On the same day, Defendant John Henry went to Jimenez's house to collect a statement. Jimenez, who was only 11 years old, had his mother with him.

50.     According to Jimenez, he was sitting on a red bike outside of Diaz's house. Like José, he saw the shooter grab the front gate.

51.      Jimenez also confirmed the gender, ethnicity, and height of the shooter: He was a Hispanic male that was 5'9".

52.     Jimenez added a few details about the shooter's clothes (he was wearing baby blue shorts) and the shooter's complexion (he had a "ruddy" or bad complexion, big lips, and bushy eyebrows).

53.     Finally, also like José, Jimenez established that the shooter had a teardrop tattoo under his right eye.

### Juan Macias's Description of the Shooter Matched the Descriptions from José and Jimenez.

54.     Juan was leaning on a car in front of the house. He was positioned so he was looking towards the house and could see everyone else.

55.     Juan heard the front gate to the gangway shaking.

56.     Juan turned towards the gate and saw a man pointing a gun through the bars of the gate. The shooter fired once.

57.     Juan then saw the shooter pull the gun back through the gate, turn to his left, and run back down the gangway.

58.     Just as José and Jimenez told the police, Juan saw the same dark-colored baseball hat on the shooter.

59.     Juan also confirmed the shooter's height. According to Juan, the shooter was around 5'7". Juan was confident about this height because the shooter was noticeably shorter that himself; Juan was 5'11".

60.     Most importantly, when the shooter turned to his left, Juan saw the same teardrop tattoo under the shooter's right eye. According to Juan, the tattoo was hard to miss: It was "big" with "thick lines."

61.     Juan believed that the shooter was a member of La Raza.

62.     Plaintiff Romero did not fit the witness descriptions of the shooter. Romero was much taller than 5'9", he did not have a "ruddy" complexion, and he did not have a tattoo under his right eye. In addition, he was not a member of La Raza and never had been.

### The Gang Affiliation with the Shooting.

63.     The shooting was likely the result of an ongoing dispute between two Chicago-based street gangs, the Latin Souls and the La Razas.

64.     Both groups are part of the "Folks Nation," a loose alliance of street gangs that identify themselves by wearing clothes or having symbols on the "right side" of their body.

65.     In Chicago, there is a rival alliance of street gangs called the "People." Members of the People identify themselves by wearing clothes or having symbols on the "left side" of their body.

66. So "People" are left-sided; "Folks" right-sided.

67. One of the most important identifiers for gang members is a "teardrop" tattoo. Everyone, including the police, the public, and the gang members themselves, knows the importance of a teardrop tattoo's location.

68. For a member of the Folks Nation, including both the Latin Souls and the La Razas, a teardrop tattoo would be located under the right eye.

69. For a member of the People, a teardrop tattoo would be located under the left eye.

70. At the time of this shooting, the Latin Souls and the La Razas were feuding amongst themselves.

71. This was not uncommon. And during this timeframe, the Folks gangs were waging a bitter civil war amongst themselves.

72. Anthony's house was in Latin Soul territory, and the police knew this area had been a hotspot for gang activity and shootings.

73. Indeed, in the months leading up to this shooting, a La Raza member had shot at a group Latin Souls, including José, standing at the exact same address. A Latin Soul was hit and taken to the hospital where she recovered.

74. Then, at the time of this shooting, Francisco was with at least three known members of the Latin Souls—Anthony, José, and Juan.

75. It was no surprise then, that after the shooting, all three eyewitnesses (who saw the shooter) confirmed that the shooter had a teardrop tattoo under his *right* eye, which is consistent with a member of the La Raza gang.

**Operation Stickman.**

76. To "solve" this shooting, as well as other cold cases, Defendants mobilized "Operation Stickman," an ongoing, undercover sting operation.

77. Operation Stickman was an effort by the CPD to use an informant, Fabian Gomez, to solve crimes.

78. The CPD Defendants were assigned to the operation, with Defendant Cepeda as a main point of contact with Gomez. Defendants McDermott and Boudreau were also involved in the Operation.

79. Gomez was a member of the Latin Saints, which were affiliated with the People alliance (i.e., the left-sided group). A "stickman" (or a stick figure) is the gang symbol for the Latin Saints, hence Operation Stickman.

80. Operation Stickman was created after Gomez was charged with kidnapping someone's brother because they owed him drug money. Gomez demanded 30 pounds of marijuana or $15,000 in ransom for the brother's safe return.

81. A joint team of the CPD and FBI busted Gomez during a coordinated and prearranged ransom drop off between Gomez and the victim.

82. To get his charges dismissed, Gomez agreed to cooperate. If Gomez provided information that led to the arrest of his fellow Latin Saints, especially for murder, Gomez's kidnapping charges would be dropped.

83. At the same time, the CPD was also using Gomez in a parallel operation called "Operation Saints and Sinners," in which Gomez was providing information about other crimes, chiefly drugs.

84. But since the start of Operation Stickman, Gomez was notoriously unreliable. In April 2001, despite providing "knowledge" about several murders Gomez claimed were committed by Latin Saints, no charges were filed.

85. Indeed, most verifiable facts that Gomez provided during his initial meeting with CPD turned out to be wrong.

86. But despite knowing that Gomez was untrustworthy, CPD continued with Operation Stickman.

87. As it turns out, it was all about money. CPD had a financial incentive to keep Operation Stickman going, which was funded by grants.

88. The grants came with strings attached, including various requirements and goals, including a quota on civil forfeitures and a required 90% conviction rate.

89. The CPD was required to provide monthly reports about the Operation's progress. And if Operation Stickman did not achieve their goals, the CPD stood to lose the Operation and future funding.

90. By the time Francisco Macias was shot, Operation Stickman had been ongoing for three months and had not resulted in a single murder charge based on Gomez's information.

91. To try and "fix" the program's complete failure, CPD started using Gomez to frame suspects by threatening and incentivizing Gomez to fabricate the evidence and false confessions they wanted.

92. This included CPD feeding Gomez information about crimes to try and falsely implicate targets while Gomez wore a wire. And if Gomez failed to get the information CPD wanted, they would physically beat him.

93. For instance, Defendant Gehrke beat Gomez when he was unhappy with his performance while Defendant Cepeda stood by and watched.

94. Defendants would also use Gomez to feed fabricated evidence and false confessions back to the CPD Defendants so they could include it in reports.

95. When it came to the investigation into the shooting of Francisco Macias, CPD decided to falsify evidence and ignore alternative suspects to instead go after Latin Saints.

96. That's where Romero came into the picture.

97. At that time, Romero was associated with the Latin Saints. And if Defendants could pin the shooting on Romero, it would be the first big win for Operation Stickman.

98. But there was a big problem with using Gomez to pin the shooting on Romero: He was **not** a member of the Folks (right-side tattoos). And everyone who saw the shooter said the teardrop tattoo was under the shooter's right eye.

99. Romero was associated with the People (left-side tattoos). And Romero did, in fact, have a teardrop tattoo under his left eye.

100. None of the other details, descriptions, or evidence about the shooter matched Romero either.

101.    Romero did not match the witness' descriptions of the shooter, and none of his fingerprints matched those pulled from the crime scene.

102.    Nevertheless, Defendants used Gomez to falsely implicate Romero as the shooter.

103.    Gomez knew that if he did not identify Romero, his "deal was off" and he would have to face his kidnapping charges.

104.    The CPD Defendants knew that Romero could not have been the shooter, but they used Gomez to falsely implicate Romero anyway.

105.    Defendant Cepeda worked with the other Defendant Officers to ensure that Gomez provided the false identification they wanted—that Romero was the shooter—and to exploit that fabricated evidence to frame Romero.

106.    Defendant Cepeda and the Defendant Officers knew Gomez was lying back to them. The evidence, the descriptions of the shooter, and the location *all* pointed to a member of La Raza being the shooter.

107.    No evidence implicated Romero or a member of the Latin Saints.

108.    There was simply no reason, much less probable cause (or any level of suspicion), to believe that Romero committed the crime.

109.    Defendants nevertheless wrote reports documenting the fabricated evidence they had created through Gomez to create their case against Romero.

### The Bogus Photo Array.

110.    The Defendant Officers then decided to bolster their fabricated evidence from Gomez with fabricated evidence from someone else.

111. Defendants manipulated a child, Jimenez, into falsely identifying Romero as the shooter in a photo array.

112. Defendants carried out this plan in Jimenez's home.

113. Defendant Szudarski later hid the real reason why Romero's picture was in the photo array (i.e., to match the fabricated statement from Gomez), instead falsely claiming that he included individuals who had recently been arrested for various crimes and who matched the shooter's description.

114. Defendants tried to arrange a live lineup with Romero, but after they failed to locate anyone to view the lineup, they were forced to release Romero.

**Gomez Creates More "Evidence" against Romero.**

115. Needing more evidence, Defendants worked with Gomez to fabricate a purported "confession" by Romero. According to Defendants, Gomez confronted Romero in the street, and they discussed the sketch of the shooter and how it looked like Romero (minus the teardrop tattoo on the wrong side). Romero than purportedly made statements implicating himself in the shooting.

116. This was entirely made up. Defendants knew it was false and based on facts they had fed to Gomez about the shooting. Defendants nevertheless wrote reports documenting the fabricated evidence they had created to (again) bolster their case against Romero.

117. Defendants then arrested Romero. He denied any involvement in the shooting and, given the well-known dispute between La Raza and the Latin Souls, explained that the shooter was probably a member of the La Raza gang.

118.    At this point, Defendants still knew that there was no probable cause to believe Romero committed the crime, and that the only evidence against him was evidence Defendants themselves fabricated.

### The Tainted Lineup.

119.    To further manufacture evidence against Romero, Defendants placed Romero in a live line-up with four other men for Jimenez to "identify."

120.    Just as they had done during the photo array, Defendants manipulated 11-year-old Jimenez into falsely identifying Romero.

121.    Even after Defendants' manipulation, Jimenez still stated that he was only "pretty sure" it was Romero, but that he was not "100% sure."

122.    After the second fabricated "identification," Defendants charged Romero with the murder of Francisco Macias.

### Gomez Manufactures Even More "Evidence" About the Shooting.

123.    Gomez then worked with Defendants to add another victory to Operation Stickman at Romero's expense.

124.    Defendants fed information and facts to Gomez to get him to falsely implicate another person in the shooting, someone named Michael Samanta.

125.    On this information alone, Defendants equipped Gomez with a wire to record a conversation with Samanta.

126.    Gomez had two conversations with Samanta. Nothing incriminating was recorded.

127.    Defendants had Gomez try a third time.

17

128.    This time, Defendants claimed that Gomez had recorded Samanta admitting that he drove Romero around while they smoked weed; that Romero randomly saw the group of boys affiliated with the Latin Souls standing on the sidewalk; and that Romero decided to ask Samanta to stop the car, grabbed a gun, ran down the gangway, fired one shot, and then ran back to the car with Samanta.

129.    There was, however, a problem with the recording: Defendants said it was unintelligible. In other words, Defendants made sure no one could verify what Samanta actually said to Gomez.

130.    To "fix" this, Defendants had Gomez falsely "interpret" the recording and create a transcript himself.

131.    Defendants knew this would allow Gomez to say what they wanted him to say—and guaranteed that Gomez could falsely claim what they needed to improve the success of Operation Stickman and to pin the murder on Romero and Samanta.

**Defendants' Suppression of Evidence.**

132.    None of the conduct discussed above was disclosed to Romero.

133.    Defendants also failed to disclose Gomez's long history of unreliable information that, if disclosed to Romero, would have destroyed Gomez's credibility, established that he was unreliable, and shown that Defendants knew all along that Gomez had falsely implicated Romero based on information and evidence provided to him by Defendants.

134.    To cover their tracks, Defendants destroyed, concealed, failed to properly document, and otherwise failed to disclose records from Operation Stickman, including documents and evidence favorable to Romero.

135.    Defendants also destroyed, concealed, or failed to properly document records about the investigation into Romero and Francisco Macias's homicide file. For instance, Defendants' files are missing notes that Defendants created about vehicles in the area, notes about Samanta's alleged confession, pictures that Defendants showed witnesses at the scene of the shooting, and more.

### Despite His Innocence, Romero is Wrongfully Convicted and Imprisoned.

136.    As a result of the misconduct and based on the false evidence described in this Complaint, Romero was convicted of a murder he did not commit.

137.    There was no physical evidence linking Romero to the crime.

138.    The initial investigation also confirmed that there was no evidence or eyewitness testimony of any kind that linked Romero to the crime.

139.    Indeed, before Jimenez and Gomez claimed to "identify" Romero, there was no probable cause to suspect him of the crime at all.

140.    When Defendants framed Romero, they knew that he had not committed the crime and that Romero was innocent.

141.    Defendants could have closed the case and released Romero, at no cost to them whatsoever. Instead, Defendants chose to fabricate and suppress evidence, all to obtain a wrongful conviction against an innocent man.

142.    At no point before the trial, or even after, did Defendants disclose the favorable evidence they had about Romero, including their own misconduct, their own fabrications, and the entire circumstances about how Romero was made a suspect in the first place, including the severe problems with Operation Stickman.

143.    The foreseeable consequences of Defendants' actions were that Romero would be wrongfully convicted of murder. In fact, the very purpose of Defendants' actions was to frame Romero, an innocent man, for a crime he did not commit.

144.    The case against Romero was based entirely on the false and fabricated evidence discussed above.

145.    Without the fabricated evidence the Defendant Officers created, Romero would never have been convicted.

146.    Romero was convicted on all charges and sentenced to 65 years in prison.

147.    Romero spent more than 22 years in prison as a result, consumed by the horror of his wrongful imprisonment and fearing he would never be released.

148.    Romero missed years with his family and friends, time that was key to building and maintaining his relationships. Romero lost family members, including his son, during his wrongful incarceration and will never be able to get that time back. Romero was deprived of all the basic pleasures of human experience all free people enjoy as a matter of right, including the freedom to live one's life as an autonomous human being. He never knew whether the truth would come out or if he would ever be exonerated.

149.    In addition to the severe trauma of wrongful imprisonment and Plaintiff's loss of liberty, Romero continues to suffer extreme physical and psychological pain and suffering, humiliation, constant fear, anxiety, deep depression, rage, and other physical and psychological effects.

150.    Romero was wrongfully branded a murderer. He has suffered profound reputational harm as a result.

### Romero's Exoneration.

151.    Romero never stopped fighting to prove his innocence, even after his conviction and imprisonment.

152.    In 2021, Romero filed a petition for postconviction relief based on new and exculpatory evidence that Romero's post-trial counsel uncovered after his conviction, including evidence related to Operation Stickman, Jimenez's bogus identifications, and Juan's eyewitness account of the shooting.

153.    In support of Romero's petition, Juan provided a sworn statement explaining that it was ***impossible*** that Romero was the shooter because he had a teardrop tattoo on the left side of his face (and not on the right like the shooter). Juan knew this since the day of the shooting.

154.    On June 26, 2024, more than 20 years after this ordeal began, a Cook County Circuit Court dismissed all charges against Romero, with the State's agreement.

**Chicago's Policy and Practice**
**Of Wrongfully Convicting Innocent Persons**
**In Violation of the Constitution.**

155.    The City of Chicago and the Chicago Police Department are responsible, by virtue of their official policies, for inflicting miscarriages of justice in scores of criminal cases just like the one endured by Romero.

156.    Since the 1980s, more than 150 cases have come to light in which Chicago police officers fabricated false evidence and/or suppressed exculpatory evidence in order to cause the convictions of innocent persons for serious crimes they did not commit.

157.    These cases include many in which Chicago police officers used the same tactics that CPD Defendants employed against Plaintiff in this case, including, but not limited to, fabricating evidence, concealing exculpatory evidence, manipulating witnesses in order to influence eyewitness identifications and testimony, fabricating narratives of how a crime occurred and/or how a person became a suspect, and using other tactics to secure the arrest, prosecution, and conviction of a person without probable cause and without regard for the person's actual guilt or innocence.

158.    At all relevant times, members of the Chicago Police Department, including the CPD Defendants in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos, and other information. This concealed material was kept in files that were maintained only at the Chicago Police Department and never disclosed to the participants of the criminal justice system. As a matter of widespread custom and

practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed or hidden at the close of the investigation rather than being preserved as part of the official file.

159. Consistent with the municipal policy and practice described in the previous paragraph, employees of the City of Chicago, including the named CPD Defendants, concealed exculpatory evidence from Plaintiff.

160. The existence of this policy and practice of suppressing exculpatory and/or impeaching material in clandestine files has been established and corroborated. *See, e.g.*, *Rivera v. Guevara*, No. 12 C 4428 (N.D. Ill.); *Fields v. City of Chicago*, No. 10 C 1168 (N.D. Ill.); and *Jones v. City of Chicago*, No. 87 C 2536 (N.D. Ill.); *Villa v. Noradin*, No. 1:25-cv-01968 (N.D. Ill.).

161. The policies and practices of file suppression at issue in *Fields* applied throughout the timeframe from the 1980s through the 2000s, including at the time of the investigation at issue here.

162. In addition, a set of clandestine files related to homicides was found in *Rivera v. Guevara*, No. 12 C 4428 (N.D. Ill.). These files, for a period in the 1980s and 1990s, contained exculpatory and impeaching evidence not turned over to criminal defendants.

163. The policy and practice of suppressing exculpatory and/or impeaching evidence was alive and well at all relevant times, including during this investigation.

164. In addition, the City of Chicago and CPD routinely used illegal tactics, including torture, physical coercion, and psychological coercion, to extract

involuntary and false confessions and statements from suspects and witnesses. There are well over 250 documented cases of Chicago police officers using torture and coercion to obtain confessions in homicide cases. The City had notice of this widespread practice of procuring false and coerced statements long before the events at issue in this case.

165. This history goes back at minimum to the 1980s and has continued well into the 2000s and includes the conduct of infamous Chicago police detectives, including Jon Burge, Michael McDermott, Kenneth Boudreau, Kriston Kato, Reynaldo Guevara, and many others. In many cases, these and other Chicago police officers have been the subject of judicial determinations that they engaged in a pattern and practice of using physical and psychological abuse to coerce false confessions and statements from suspects and witnesses, and/or the exonerations resulted from DNA evidence proving the confessions were false, and/or the exonerations resulted in the State of Illinois certifying that the individual was innocent despite an earlier false confession.

166. Moreover, the City of Chicago and CPD routinely failed to investigate cases in which Chicago police detectives recommended charging an innocent person with a serious crime, and no Chicago police officer has ever been disciplined as a result of his misconduct in any of those cases.

167. Prior to and during the period in which Plaintiff was falsely charged and convicted, the City of Chicago also operated a dysfunctional disciplinary system for Chicago police officers accused of serious misconduct. The City almost never imposed

significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. Further, the disciplinary apparatus had no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

168.    In the case of *Klipfel v. Bentsen*, No. 94 C 6415 (N.D. Ill.), a federal jury in Chicago returned a *Monell* verdict against the City, finding that the City was responsible for maintaining a code of silence and a deeply flawed disciplinary system that allowed Chicago police officers to operate a far-reaching, long-running criminal enterprise that included the subversion of homicide investigations.

169.    As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence within CPD, which has been acknowledged by leaders of the Chicago Police Department and elected officials in Chicago. In accordance with the code of silence, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

170.    The Code of Silence is so pervasive that it often involves other law enforcement officers and agencies.

171.    As a result of the City of Chicago's established practices, officers (including the CPD Defendants here) have come to believe that they can violate the civil rights of members of the public and cause innocent people to be charged with serious crimes without fear of adverse circumstances. The practices that enable this belief include failing to track and identify officers who are repeatedly accused of

25

serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct, and facilitating a code of silence within CPD. As a result of these policies and practices of the City of Chicago, members of CPD act with impunity when they violate the constitutional and civil rights of citizens.

172. Given this extensive history of misconduct and the City of Chicago's failure to meaningfully supervise or discipline officers, it is apparent that the CPD Defendants engaged in such misconduct because they had every reason to believe that the City of Chicago and its Police Department condoned such behavior.

173. The City of Chicago and CPD also failed in the years prior to Plaintiff's wrongful conviction to provide adequate training to Chicago police detectives and other officers in many areas, including the following:

a. The conduct of live lineup, photographic, and other identification procedures;

b. The constitutional requirement to disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory evidence has been identified in order to ensure that the evidence is made part of the criminal proceeding;

c. The need to refrain from physical and psychological abuse, and manipulative and coercive conduct, in relation to suspects and witnesses;

d. The risks of wrongful convictions and the steps police officers should take to minimize risks;

26

e.   The risks of engaging in tunnel vision during the investigation; and

f.   The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

174.   The need for police officers to be trained in these areas was and remains obvious. The City's failure to train Chicago police officers as alleged in the preceding paragraph caused Plaintiff's wrongful conviction and his injuries.

175.   The City's failure to train, supervise, and discipline its officers, including the CPD Defendants, condones, ratifies, and sanctions the kind of misconduct that the Defendants committed against Plaintiff in this case. Constitutional violations such as those that occurred in this case are encouraged and facilitated as a result of the City's practices and de facto policies, as alleged above.

176.   The City of Chicago and final policymaking officials within CPD failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

177.   The policies and practices described in the foregoing paragraphs were also approved by the City of Chicago policymakers, who were deliberately indifferent to the violations of constitutional rights described herein.

**Defendant Officers' History of Misconduct.**

178.    Many of the CPD Defendants that were involved in the framing of Plaintiff have a long history of misconduct.

179.    Several of the CPD Defendants—including Defendants Cepeda, Gehkre, McDermott, and Boudreau—have had multiple complaints sustained against them, including allegations of torture.

180.    For instance, there have been multiple findings that Defendants Gehrke and Cepeda tortured suspects to coerce false confessions. And when it comes to Defendant Boudreau, his sheer frequency and notoriety of misconduct, including coercing false confessions, has caused Chicago's Law Department to dub wrongful conviction cases involving him as "a Boudreau case."

181.    Collectively, the CPD Defendants have been named in over a dozen civil lawsuits related to misconduct during their employment with the Chicago Police Department, costing the City tens of millions of dollars.

182.    The CDP Defendants' framing of Plaintiff was the latest in a long line of egregious misconduct, consistent with their complete disregard for the constitutional and civil rights of civilians.

**LEGAL CLAIMS**

**COUNT I**
**42 U.S.C. § 1983 – Due Process**
**(Fourteenth Amendment)**

183.    Plaintiff incorporates each paragraph of this complaint as if fully restated.

28

184.     As described in detail above, the Defendant Officers, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial and his right not to be wrongfully convicted and imprisoned.

185.     In the manner described more fully above, the Defendant Officers fabricated witness statements, identifications, and other evidence that falsely implicated Plaintiff in the crime.

186.     The Defendant Officers knew this evidence was false.

187.     The Defendant Officers obtained Plaintiff's conviction using this false evidence, and they failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff during his criminal case.

188.     The Defendant Officers procured witness statements and evidence implicating Plaintiff which they knew to be false, including from both Jimenez and Gomez. Despite this, they caused these statements to be used during Plaintiff's criminal trial.

189.     In addition, the Defendant Officers deliberately withheld exculpatory evidence from state prosecutors, Plaintiff, and Plaintiff's criminal defense attorneys, including evidence that they had manufactured the false statements and evidence implicating Plaintiff, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

190.    In addition, based upon information and belief, the Defendant Officers concealed, fabricated, and destroyed additional evidence that is not yet known to Plaintiff.

191.    The Defendant Officers' misconduct resulted in the unjust and wrongful criminal prosecution and conviction of Plaintiff and the deprivation of Plaintiff's liberty, thereby denying his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Plaintiff could not have and would not have been pursued.

192.    The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

193.    As a result of Defendant Officers' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, forced and involuntary prison labor, and other grievous and continuing injuries and damages as set forth above.

194.    The misconduct described in this Count was undertaken by the CPD Defendants pursuant to the policy and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count V.

### COUNT II
### 42 U.S.C. § 1983 – Malicious Prosecution and Unlawful Detention
### (Fourth and Fourteenth Amendments)

195.    Plaintiff incorporates each paragraph of the complaint as if fully restated here.

196.    In the manner described above, the Defendant Officers, acting as investigators, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent, in violation of his rights secured by the Fourth and Fourteenth Amendments.

197.    In so doing, these Defendant Officers maliciously prosecuted Plaintiff and caused Plaintiff to be deprived of his liberty without probable cause and to subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

198.    The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

199.    As a result of Defendant Officers' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain, suffering, and other grievous and continuing injuries and damages as set forth above.

200.    The misconduct of the CPD Defendants described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count V.

## COUNT III
### 42 U.S.C. § 1983 – Failure to Intervene

201.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

202.    In the manner described above, during the constitutional violations described herein, one or more of the Defendant Officers stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the duty and the opportunity to do so.

203.    The Defendant Officers had ample, reasonable opportunities as well as the duty to prevent this harm but failed to do so.

204.    The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

205.    As a result of Defendant Officers' misconduct as described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

206.    The misconduct of the CPD Defendants described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count V.

## COUNT IV
## 42 U.S.C. § 1983 – Conspiracy to Violate Constitutional Rights

207.  Plaintiff incorporates each paragraph of this complaint as if fully restated here.

208.  In the manner described more fully above, the Defendant Officers, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to fabricate evidence and to detain, prosecute, and convict Plaintiff for the Francisco Macias shooting, regardless of Plaintiff's guilt or innocence, and thereby to deprive him of his constitutional rights.

209.  Additionally, before and after Plaintiff's conviction, the Defendant Officers conspired to deprive Plaintiff of favorable information to which he was lawfully entitled and which would have led to either not being charged, being acquitted, or receiving a faster exoneration.

210.  In this manner, the CPD Defendants, acting in concert with other unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

211.  In furtherance of the conspiracy, each co-conspirator engaged in and facilitated numerous overt acts, including but not limited to those set forth above— such as fabricating evidence, withholding exculpatory evidence, and obtaining false statements—and was an otherwise willful participant in joint activity.

212.  As a direct and proximate result of the illicit prior agreement and actions in furtherance of the conspiracy referenced above, Plaintiff suffered and

continues to suffer grievous injuries, including loss of liberty, physical injury, psychological trauma, and emotional damages, as set forth above.

213. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless indifference to the rights of others and with total disregard for the truth and Plaintiff's clear innocence.

214. The misconduct by the CPD Defendants described in this Count was undertaken pursuant to the policy and practice of the City in the manner more fully described in Count V.

## COUNT V
### 42 U.S.C. § 1983 – Policy and Practice Claim
### Against the City of Chicago

215. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

216. As described in detail above, the City of Chicago is liable for the violation of Plaintiff's constitutional rights because Plaintiff's injuries were caused by the policies, practices, and customs of the City of Chicago, as well as by the actions of policy-making officials for the City of Chicago.

217. At all times relevant to the events described in this complaint and for a period of time prior and subsequent thereto, the City of Chicago failed to promulgate proper or adequate rules, regulations, policies, and procedures for: conducting photographic and live lineup procedures by officers and agents of the Chicago Police Department and City of Chicago; the collection, documentation, preservation, testing, and disclosure of evidence; the writing of police reports and taking of investigative

34

notes; obtaining statements and testimony from witnesses; and maintenance of investigative files and disclosure of those files in criminal proceedings.

218.    In addition, or alternatively, the City of Chicago failed to promulgate proper and adequate rules, regulations, policies, and procedures for the training and supervision of officers and agents of the Chicago Police Department and the City of Chicago, with respect to these subjects.

219.    These failures to promulgate proper or adequate rules, regulations, policies, and procedures were committed by officers and agents of the Chicago Police Department and the City of Chicago, including the CPD Defendants.

220.    In addition, at all times relevant to the events described in this complaint and for a period of time prior thereto, the City of Chicago had notice of a widespread practice and custom by CPD officers and agents and the City of Chicago under which individuals suspected of criminal activity, such as Plaintiff, were routinely deprived of their right to due process. For instance, it was common that suspects were prosecuted based on fabricated evidence, including fabricated witness statements and identifications.

221.    What's more, at all relevant times and for a period of time prior thereto, there existed a widespread practice and custom among officers, employees, and agents of the City of Chicago, under which criminal suspects, such as Romero, were deprived of exculpatory evidence pertaining to how eyewitness procedures were administered and/or how witnesses came to make "statements" against or "identify" criminal defendants. This practice of suppression of evidence includes not only the

City's "street file" practices, but also other instances—in dozens of cases—where witness statements were fabricated in various ways, such as including false promises, threats, coercion, and other methods.

222.  In addition, at all times relevant to the events described in this complaint and for a period of time prior thereto, the City of Chicago had notice of widespread practices by CPD officers and agents and the City of Chicago, which included one or more of the following: (1) officers did not record investigative information in police reports, did not maintain proper investigative files, or did not disclose investigative materials to prosecutors and criminal defendants; (2) officers falsified statements and testimony of witnesses; (3) officers fabricated false evidence implicating criminal defendants in criminal conduct; (4) officers failed to maintain or preserve evidence or destroyed evidence; and (5) officers pursued wrongful convictions through profoundly flawed investigations.

223.  These widespread practices, individually and together, were allowed to flourish because the leaders, supervisors, and policymakers of the City of Chicago directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control their officers, agents, and employees on proper interrogation techniques and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses, such as those affecting Plaintiff.

224.  The above widespread practices and customs, which are so well settled as to constitute de facto policies of the City of Chicago, were able to exist and thrive,

individually and together, because policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

225.     As a result of the policies and practices of the City of Chicago, numerous individuals have been wrongly convicted of crimes they did not commit.

226.     In addition, the misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago in that the constitutional violations committed against Plaintiff were committed with the knowledge or approval of persons with final policymaking authority for the City of Chicago or were actually committed by people with such final policymaking authority.

227.     Plaintiff's injuries were directly and proximately caused by officers, agents, and employees of the City of Chicago, including but not limited to the individually named CPD Defendants, who acted pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

## COUNT VI
### State Law Claim – Malicious Prosecution

228.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

229.     In the manner described above, the Defendant Officers, acting as investigators, individually, jointly, and in conspiracy with one another, as well as within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate and to continue and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so.

230.    In so doing, the Defendant Officers caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

231.    The judicial proceedings were terminated in Plaintiff's favor and in a manner indicative of his innocence when his conviction was vacated and charges against him were dropped in June 2024, and he received a certificate of innocence in April 2025.

232.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and in total disregard of the truth and Plaintiff's clear innocence.

233.    As a result of the Defendant Officers' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT VII
### State Law Claim – Intentional Infliction of Emotional Distress

234.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

235.    The actions, omissions, and conduct of the Defendant Officers as set forth above were extreme and outrageous. These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

236.    The misconduct of the Defendant Officers was objectively unreasonable and was undertaken with total disregard for the truth and Romero's clear innocence.

237.    As a result of the Defendant Officers' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT VIII
## State Law Claim – Willful and Wanton Conduct

238.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

239.    At all times relevant to this complaint, the Defendant Officers had a duty to refrain from willful and wanton conduct in connection with the Francisco Macias murder investigation.

240.    As described above, it was foreseeable to Defendant Officers that fabricating evidence and suppressing exculpatory evidence, in addition to the other misconduct alleged in this complaint, in order to frame Plaintiff, would inevitably result in extreme harm to him. Avoiding this injury to Plaintiff would not have burdened Defendant Officers in any way.

241.    Notwithstanding that duty, the Defendant Officers acted willfully and wantonly through a course of conduct that showed an utter indifference to, or conscious disregard of, Plaintiff's rights and actual innocence.

242.    As a result of the Defendant Officers' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation,

degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT IX
## State Law Claim – Civil Conspiracy

243.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

244.    As described more fully in the preceding paragraphs, the Defendant Officers, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose and/or to achieve a lawful purpose by unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

245.    In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

246.    The violations of Illinois law described in this complaint, including Defendant Officers' malicious prosecution of Plaintiff and their intentional infliction of emotional distress, were accomplished by Defendant Officers' conspiracy.

247.    The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

248.    As a result of the Defendant Officers' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation,

degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT X
### State Law Claim – *Respondeat Superior*

249.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

250.    While committing the misconduct alleged in the preceding paragraphs, the CPD Defendants were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment.

251.    Defendant City of Chicago is liable as principal for all torts committed by its agents.

## COUNT XI
### State Law Claim - Indemnification

252.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

253.    Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

254.    The CPD Defendants were employees, members, and agents of Defendant City of Chicago, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

255.    Defendant City of Chicago is responsible to pay any judgment entered against the CPD Defendants.

**WHEREFORE**, Plaintiff FRANCISCO ROMERO, respectfully requests that this Court enter a judgment in his favor and against Defendants Allen Szudarski, John Henry, Thomas Cepeda, Daniel McNally, George Holmes, William Gehrke, Robert Trlak, William Svilar, Steven Konow, Craig Coughlin, Daniel Brannigan, Michael McDermott, Kenneth Boudreau, the City of Chicago, and as-yet unknown employees of the City of Chicago, awarding compensatory damages, attorneys' fees, and costs against each Defendant, punitive damages against each of the Individual Defendants, and any other relief that this Court deems just and appropriate.

## JURY DEMAND

Plaintiff, FRANCISCO ROMERO, hereby demands a trial by jury pursuant to Rule of Civil Procedure 38(b) on all issues so triable.

Dated: June 25, 2025.                    Respectfully submitted,

                                         **FRANCISCO ROMERO**

                                         BY:  /s/ *Brian A. Morris*
                                              *One of Plaintiff's Attorneys*

Jon Loevy
Steve Art
Anand Swaminathan
Brian Morris
Jordan Poole
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
morris@loevy.com

Jennifer Blagg
Eric Bisby
BLAGG LAW
1509 W. Berwyn Ave. Suite 201E
Chicago, Illinois 60640
(773) 859-0081
jennifer@blagglaw.net